# BENJAMIN S. JONES *vs.* OLIVER D. COLLINS AND J. L. PARADEE, EXECUTORS.

*Testamentary Capacity—Admissibility of Evidence on Trial of Caveat—Opinions of Witnesses—Insane Delusions—Burden of Proof—Instructions to Jury.*

The highest degree of mental soundness is not required in order to constitute testamentary capacity, but one who is of sound and disposing mind, capable of making a valid deed or contract, possesses capacity to make a will.

On the trial of a caveat to a will, involving the question of testamentary capacity, a witness who had stated facts sufficient to authorize him to express an opinion as to the testator's mental capacity, was asked whether, from these facts, the testator was, in the opinion of the witness, entirely sane. *Held*, that this question was improper because the test of testamentary capacity is not entire sanity but the capacity to make a valid deed, and also because the question fails to limit the inquiry to the mental condition of the testator at the time the will was made.

Witnesses for the caveatees, upon the trial of an issue involving mental capacity, after testifying that they had known the testator for a certain number of years and had had various kinds of business transactions with him were asked whether in their opinion the testator was capable of making a valid deed or contract, and others of such witnesses were asked whether they had observed during their intercourse with the testator anything that indicated a lack of mind or of understanding on his part. *Held*, that both questions are free from serious objection, though the form of the latter is somewhat unusual, and that, since both questions are designed to show competency in general, it is not necessary that they should be directed to the time of the execution of the will.

When witnesses are called to prove the mental competency of a testator they may be asked questions relating to the whole period of their acquaintance with him.

A subscribing witness to a will, who had known the testator for forty years, may be asked for his opinion as to the testator's mental capacity without first being required to prove that he made an investigation of the subject at the time of attesting the will.

A physician testified that he had known the testator for thirty years and had prescribed for him at the office, but never attended him. *Held*, that this witness may be asked his opinion as to the testator's mental capacity without first stating the facts in which the opinion was founded and that, as in the case of a subscribing witness, the value of his opinion is to be tested on cross-examination.

At the instance of the caveatees upon an issue involving capacity to make
a will the jury were instructed that the testator was capable if he "un-
derstood the nature of the business he was engaged in, recollected the
property he meant to dispose of, and the persons to whom he meant to
give it, and understood the manner in which he disposed of it and the
relative claims of the different persons who are or ought to be the objects
of his bounty." *Held*, that this prayer is not too general under the cir-
cumstances of this case.

When it has been shown that a testator was at one time wholly insane,
or was insane with lucid intervals, then the burden of proof is upon the
party alleging his capacity at the time the will was executed to show
that he had fully recovered or that the will was executed during a lucid
interval. But when the alleged incapacity was merely a delusion, the
burden is on the party attacking the will to show that it was made as
the direct effect of such delusion. Consequently instructions to the
jury which confound the law applicable to a will made by a man who
has once been insane with the law applicable to a will made by one
who has suffered from a delusion, are properly rejected.

On the trial of a caveat to a will by which the testator devised nearly all
of his estate to his grandchildren, a prayer is not objectionable by which
the jury are instructed that even if they found that the testator was
actuated by hostility towards his wife and children, yet if he had suffi-
cient capacity to make a valid deed or contract, and the will was in ac-
cordance with his own judgment and choice as to the disposition of his
property, and that the said hostility was not altogether without cause,
then their verdict must be for the defendants.

Appeal from the Circuit Court for Worcester County (PAGE,
C. J., and LLOYD, J.)

*Caveator's 1st Prayer.*—That if the jury find from the evi-
dence that the testator, Benjamin I. Jones, for many years
after his marriage exhibited no unusual signs of mental dis-
order, beyond high temper, and further that afterwards as far
back as ten to fifteen years or more, he began to show signs
of unusual mental disturbance, possessed of delusions that his
children were robbing him, and that his wife was aiding and
abetting them, and further find that without any reasonable
cause he became filled with hatred to both his children and his
wife, pursued his wife with deadly weapons when crossed by
anything by others, and at times without any immediate cause
for anger against any one, would leave his work in the fields
and go to his house and without any prelude attack her with

deadly weapons, and further find that in the night he would wake up and attack his wife, pursue her from room to room, break the doors with an axe, go out into the yard and throw bricks at the windows and house, turn the plank walks in the yard over, throw bricks and missiles at the fowl roosting on the roosting places, and cry out to send those killed to his daughter's husband, and that he pursued his wife without any reasonable ground to the houses of relations when she had fled from his violence, and attempted to kill her with knife and axe. And shall find that he was animated with an unreasonable hatred to both her and his children, and drove his children from his home with personal violence, attacking one with the butt end of his gun because late for breakfast. And further find that his violence was continuous, and his out-cries so continuous and violent, so abusive and indecent towards his wife and children, as to be heard at long distance, so much so as to arouse his neighbors to appeal to the law to put a stop to it. And shall further find that this condition increased as he grew older, that the paroxysms grew more frequent and lasted longer, sometimes for ten days, and the intervals between the paroxysms grew shorter, up to the last of his life. And that he was attacked about five years ago with a bad cancer on his head, which, being removed, broke out again, on or in his ear, and extended to his eye, and caused him great suffering, and caused him to go to several hospitals for treatment, and that he finally lost both ear and eye from the disease and died from it. And shall further ·find that he became greatly enfeebled physically from said disease. And shall further find that he had just had one of those violent paroxysms the few days preceding his visit to Messrs. Collins & Jones to have his will drawn, and was still under its influence the morning he left his house to go to them for that purpose. And shall further find that the said delusions and hatred continued to possess his mind after the said paroxysms had subsided, and was the subject of his talk frequently with persons, not of his family or connections, with whom he had business, and was firmly fixed in his mind, then they may find from such condi-

tion and the opinions in evidence of those who were in a position to observe him when he was in the said paroxysms and after they subsided, that he was insane at the time of such paroxysms, and further that the said delusions held possession of his mind and influenced him after they subsided and rendered him unfit to make a distribution of his property by will with a full and fair understanding of those entitled to his bounty, and their verdict may be on the first issue for the caveator. (*Rejected.*)

*Caveator's 2nd Prayer.*—That if the jury find that the testator was insane during the paroxysms described in the evidence, then, though they may find lucid intervals, the presumptions of law are that his mental derangement continued and the burden is on the caveatees to show he had a disposing mind during·the lucid intervals and at the time he executed the paper-writing offered as his will. (*Rejected.*)

*Caveator's 5th Prayer.*—If the jury find on all the evidence in the case that the testator was of unsound mind and incapable of making a valid deed or contract when he executed the will offered in evidence, then their verdict on the first issue must be for the caveator. (*Granted.*)

*Caveatee's 3rd Prayer.*—If the jury find from the evidence that Benjamin I. Jones was at the time of executing the will offered in evidence, of sound and disposing mind, and capable of making a valid deed or contract, then he had sufficient mental capacity under the law of Maryland to enable him to make a valid will, and what is meant by the words sound and disposing mind and capable of making a valid deed or contract in respect to making a will is, that he understood the nature of the business he was engaged in, recollected the property he meant to dispose of, and the persons to whom he meant to give it, and understood the manner in which he disposed of it, and the relative claims of the different persons who are, or ought to be, the objects of his bounty. (*Granted.*)

*Caveatee's 7th Prayer.*—That even if the jury believes that Benjamin I. Jones was actuated by hostility or aversion towards his wife and children, if the jury find that he had

at the time he made the will offered in evidence the degree of capacity described in the defendant's 3rd prayer, and that the provisions of the will were made by him in accordance with his own judgment and choice as to the disposition of his property, and that the hostility above named was not altogether without cause, that their verdict must be for the defendants. (*Granted.*)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*John H. Handy,* (with whom was *C. O. Melvin* on the brief), for the appellant.

*Robley D. Jones,* (with whom was *O. D. Collins* on the brief), for the appellees.

PEARCE, J., delivered the opinion of the Court.

This is an appeal from rulings of the Court below at the trial of issues sent from the Orphans' Court of Worcester County, on a caveat to the last will and testament of Benjamin I. Jones.

Two issues were sent to the Circuit Court: First, "Was Benjamin I. Jones of sound and disposing mind, and capable of making and executing a valid deed or contract at the time of making and executing a paper-writing bearing date February 7th, 1900, purporting to be his last will and testament, and offered to the Orphans' Court of Worcester County for probate." The second inquired whether he was induced to make and execute said paper-writing by fraud and undue influence practised on him, but this was apparently abandoned at the argument in this Court and it is unnecessary to set it out here in full.

On these issues the jury rendered a verdict for the caveatees and the caveator has appealed.

By the will offered for probate the testator bequeathed to each of his four children one dollar, and to his wife seven hundred dollars in lieu of dower in all his real estate upon

condition she should consent to the sale of the same free of her right of dower; all the residue of his estate, including the legacy to his wife, if she should renounce the same, he bequeathed equally to his grandchildren living at his death, their respective shares with accumulated interest to be paid to each as they reached twenty-five years of age.

We will consider first the questions of evidence.   Mrs. Mary Gootee testified for the caveator that she was the sister of the testator's wife, and had known him ever since his marriage; that at first she observed nothing in his behavior different from that of other men; that after his marriage she became better acquainted with him and her acquaintance continued up to his death; that she was accustomed to go to his house and had seen some pretty bad behavior there; that he abused his wife and called her ill names with bitter oaths, and that his wife gave him no cause for his conduct; that he would get mad when he was at work in the field and abuse her for everything; that she left her husband seven or eight times, or a dozen, he had been so bad to her; that he would run her off in the night and she would go to witness' house or other places; that on one of these occasions her husband came after her, and she told him she had gone back so many times and could not stay that she would not go then, and he got his knife out after her, and witness got between them.   That the year before the time of her testifying he came to witness' house on Sunday and wanted his daughter and Ben (his son) put up as a target to shoot at, right in her yard.   That there was no cause for such talk but talking about the money he lost with the Halls.   That about five years before that time a cancer developed on his head, that it was removed and reappeared in his ear, and that after this his mind would fly off.

The caveators counsel then asked her this question: "Now, Mrs. Gootee, from your acquaintance with Mr. Jones, and from the facts you observed with regard to him, is it your opinion that Mr. Jones was *entirely sane*," to which question the caveatees objected, and the Court sustained the objection. This constitutes the first exception.   Counsel upon both sides

argued this exception upon the assumption that the question was excluded on the ground that no proper foundation had been laid for the expression of an opinion by this witness, but we think it is clear Mrs. Gootee was competent to express an opinion as to the testator's testamentary capacity according to the rule laid down in *Townshend* v. *Townshend*, 7 Gill 28, and since repeatedly declared in this Court, she having stated facts and circumstances abundantly fortifying her opinion to render it competent evidence. In *Weems* v. *Weems*, 19 Md. 345, it was broadly suggested by the Court that a brother of the testator who had been intimate with him through life, was competent to express an opinion upon his testamentary capacity without stating the facts and circumstances upon which it was founded, though we are not to be understood as expressing any opinion upon this relaxation of the rule. We apprehend that the ruling of the Court in the case before us was based upon the form of the question, which we think clearly objectionable, because it simply asked whether she regarded him as " *entirely sane*," and did not at all invoke her opinion as to the subject of the issue, viz., his testamentary capacity at the date of the execution of the will. The test of testamentary capacity in this State is not whether the testator is " entirely sane," but whether he is " of sound and disposing mind, and capable of executing a valid deed or contract." In *Davis* v. *Calvert*, 5 G. & J. 269, and in *Colvin* v. *Warford*, 20 Md. 357, the meaning of these words has been defined to be " that the testator must have had sufficient capacity, at the time of executing the will, to make a disposition of his estate with judgment and understanding in reference to the amount and situation of his property, and the relative claims of the different persons who should have been the objects of his bounty ;" and the Court added, " but the meaning of the words *judgment and understanding* is not that the jury should reject the will because they may believe that it was in its provisions unjust or injudicious, though those provisions may be considered by them in deciding the question as to the testators capacity."

In *Higgins* v. *Carlton*, 28 Md. 115, an instruction was ap-

proved in which the jury were told that "neither age, nor sickness, nor extreme distress, nor debility of body will disqualify a person from making a will, *if sufficient intelligence remains.*" In *Whitney* v. *Twombly*, 136 Mass. 145, the Court said: "The highest degree of mental soundness is not required in order to constitute capacity to make a testamentary disposition of property;" and in *Sloan* v. *Maxwell*, (2 Greens Ch.) 3 N. J. Eq. 563, where the rules by which testamentary capacity should be determined, and the reasons which led to their development, were reviewed with great common sense and much learning, it was held, "that to constitute a sound and disposing mind, it is not necessary that the mind should be unbroken or unimpaired, unshattered by disease or otherwise." In that case the Court, quoting from *Den* v. *Vancleve*, (2 Southard), 5 N. J. L. 660, said, "It has not been understood that a testator must possess the qualities of sound and disposing mind and memory in the highest degree. * * * Few indeed would be the wills confirmed, if this is correct. Pain, sickness, debility of body, must according to its violence or duration, in greater or less degree weaken or derange the mind, but the derangement must be such as deprives him of the rational faculties common to man." It would perhaps be going too far, in view of the language of our statute upon this subject, to adopt the last clause of the passage cited above, but we can safely say, the derangement must be such as renders him incapable of executing a valid deed or contract. There is but a thin partition between entire sanity and that degree of eccentricity, or abnormal subjection to temper or passion, which may be held to constitute want of sanity, and if for the standard of testamentary capacity provided by our statute is to be substituted the testator's entire sanity, very few could make testaments which could withstand the assaults of disappointed relatives.

But another fatal objection to the question is, that being directed not to the proof of capacity, but of incapacity, it is essential to show that such incapacity existed at the date of the execution of the will and this question fails so to direct or

limit the inquiry, so that, if answered, it would not have been possible to say that the witness referred to the time of execution. *Brashears* v. *Orme*, 93 Md. 442. The 3rd, 4th, 5th, 6th, 7th and 8th exceptions may be conveniently considered together. In all of these, witnesses were called by the caveatees and proved more or less extended acquaintance with the testator, and business transactions with him varying in character and frequency. Some of these witnesses were then asked whether in their opinion the testator was capable of making a valid deed or contract, and others were asked whether they had observed during their intercourse with him, anything that indicated a lack of mind or of understanding on his part, to all of which questions the caveator objected, but the objections were overruled, and the witnesses answered either that he was competent to execute a valid deed or contract, or that they had observed no indication of lack of mind or understanding on his part. It is contended that the form of the latter question is objectionable and that in both the inquiry should have been directed to the time of the execution of the will. The form of the latter question is somewhat unusual, but we think it is free from serious objection, since the answer, however given, must reflect upon the testator's competency. That form has received the sanction of the Massachusetts Supreme Court in *Nash* v. *Hunt*, 116 Mass. 237, where a witness was allowed to state in answer to a question so framed, "that he had observed no incoherence of thought, nor anything unusual or singular in respect to his memory."

Upon the other ground of objection it must be observed that these witnesses were called to prove competency, and that, as reflecting upon the charge of incompetency, the range of inquiry covers any period either before or after the execution of the will. This was decided in *Townshend* v. *Townshend, supra*, where the question "the whole period of the witness acquaintance with him," and was emphasized in the last case in this Court. *Brashears* v. *Orme, supra*.

We therefore find no error in these rulings.

In the ninth exception, Dr. Geo. W. Bishop testified that he

was one of the subscribing witnesses to the will, and that he had known the testaor for over forty years and saw nothing unusual in his manner. He was then asked if he considered him capable of executing a valid deed or contract, to which question objection was made, but he was allowed to answer, and answered, yes. The contention of the appellant is that it was the duty of the cavetees to prove by the subscribing witness, before putting this question, that at the time of the execution of the will he investigated the mental capacity of the testator, and it is claimed that this position is sustained in *Townshend* v. *Townshend, supra.* But we do not so understand the law, nor do we think it was so held in the decision mentioned. It is the duty of the subscribing witnesses to inform themselves of the testator's mental capacity before attesting the will. Witnesses are required by the law not alone to protect the testator against fraud in the execution of his will, but also to judge of his capacity, which is primarily established by their oaths when the will is offered for probate, but it will be presumed, until the contrary is made to appear, that they have discharged this duty. It was within the power of the caveator in this case by cross-examination to ascertain how far Dr. Bishop had satisfied himself of the testator's competency, and if it had appeared he had made no effort to inform himself, or that he entertained any doubt on the subject, that fact would have gone to the weight of his testimony. There may be circumstances, such as existed in *Williams* v. *Lee,* 47 Md. 321, which as was there held, may justify friends and relatives in complying with the request of a person to witness a will where they know or believe the supposed testator to be incompetent, but in the absence of such peculiar circumstances, persons called on to witness a will when they believe the maker to be incompetent, cannot be justified in participating in an act of this character which must either be declared a farce when offered for probate, or lead to litgation of the most unfortunate character. We perceive no error in the ruling upon this exception.

The second exception yet remains to be considered. The

first witness called by the caveatee was Dr. John King, a practising physician of Pocomoke City, *whose testimony in full is* in these words:   " Have  known  Benjamin  I. Jones  thirty or thirty-five years ; never attended  him ; only at the office prescribed for him twice.   About  two  years ago, and again during February of the present year."   He was then immediately asked, " Was  Benjamin  I. Jones,  in your opinion capable of executing a valid deed or contract ?"   The caveator objected, but  the  Court  overruled  the  objection, and  the witness answered, " yes."

A majority of the Court is of opinion that this question was properly allowed as falling  within  the  general  principle expressed in *Crockett* v. *Davis,* 81 Md. 149, in these words :  " It is well settled in this State that a physician can testify as to the mental capacity of a testator without first stating the facts and circumstances on which the opinion was formed ;" and that, as in the case of a subscribing witness, the weight of his opinion is to be tested upon  cross-examination.   From this view, *as applicable to the question propounded to Dr. King upon the foundation laid in this case,* the writer of this opinion emphatically dissents, and his views upon this exception will be appended to this opinion.

This brings us to the rulings upon the prayers, and in these we find no error.

As the record  shows  no evidence whatever was  offered  to prove fraud or undue influence, the appellees' second prayer may be taken as conceded.

The appellees' first, fourth and fifth prayers are open to no criticism that we can perceive, and no objection was urged to them in argument.

The only criticism directed to the appellees' third prayer is that while it is in the very  language  of the  prayer  approved in *Brown* v. *Ward,* 53 Md. 382, it is not qualified, as in that case, by requiring it to be considered in connection with all the other instructions granted upon that subject.   But we do not think the definition of the words " sound and disposing mind and capable of executing a valid deed or contract " is too

general for the facts of this case, and there was no need, therefore, of the qualification annexed in 53 Md.

It is urged in objection to appellees' sixth prayer that it requires the jury to find for the defendant on the first issue if they believe the testator was capable of executing a valid deed or contract at the time of executing the will, though they may have believed him incapable at some prior time; and that the prayer should have instructed the jury that the burden of proof was on the caveatees to show recovery from incapacity. This is the correct rule where permanent insanity is established, or insanity with lucid intervals. In the one case the caveatee must show full recovery, and in the other, that the will was executed in a lucid interval. But where the alleged incapacity is the result of an insane delusion the burden is on the caveator to show that the will is the direct offspring of such delusion.

We perceive no objection to the appellees' seventh prayer. In *Brown* v. *Ward*, 53 Md. 392, it was said: "A person entertaining a violent dislike to another may be actuated in so doing by a fancied and unusual cause, yet it would not necessarily be such a delusion as would justify his being pronounced insane. If there was a sufficient cause for such antipathy to those nearest in relation and blood, it would not invalidate the will, if its provisions were in accord with his own judgment and choice," and the jury found he had the degree of testamentary capacity described in the caveatees third prayer.

The appellant's first prayer appears to be based partly upon the law applicable to confirmed insanity, and partly upon that applicable to intermittent insanity with lucid intervals, and as framed would be misleading to the jury, even if the legal propositions sought to be embodied therein were correct when analyzed and separated.

In addition to this there are recited therein numerous alleged facts of which there is no evidence in the record, and this alone would require its rejection.

The appellant's second and third prayers attempt to apply to occasional paroxysms of mental disturbance, the rule ap-

plicable to confirmed insanity, and were therefore properly rejected.

The appellant's fourth prayer reversed the rule relating to the burden of proof in case of mental delusions, and could not therefore have been granted.

It results from the views of the majority of the Court that the rulings of the Circuit Court must be affirmed.

*Rulings affirmed.*

(Decided January 17th, 1902.)

PEARCE, J., delivered the following opinion upon the Second Exception.

The foregoing opinion expresses the view of the majority of the Court upon the second exception, but not the view which I entertain. I regard the question as one of importance, not directly within the scope of any decision in this State, and not ruled, so far as I am informed, by any decision elsewhere precisely in point.

After careful consideration I am unable to adopt the view of the majority upon this exception, and believe the conclusion I have reached will commend itself to sound reason and is logically deduced from the views of our own and other Courts to which I shall refer. The question I am considering was evidently admitted upon the assumption that it fell within the general principle declared in *Crockett* v. *Davis*, 81 Md. 149, and alluded to in the opinion of the Court, and nothing that I shall here say can be properly regarded as impairing the authority of the rule there laid down or of the principle upon which it rests. This rule, as I understand it, does not imply that a physician may testify without being *in possession* of facts and circumstances on which to form an opinion, *but that being in their possession*, he is not required to state them as ordinary witnesses must do, and in my opinion this case does not fall within the operation of the rule invoked, because the record fails to show that the witness had any such knowledge of the testator as would enable him as a medical man to form a professional opinion, without which he must

stand upon the same footing as a non-professional witness called to respond to the same question. In *Townshend* v. *Townshend*, 7 Gill, 27, the Court after speaking of the privilege of an attesting witness in this regard says, "and it is equally true, *as a general proposition*, that the mere naked opinions of other witnesses, *not occupying the position of medical men*, are inadmissible in reference to the mental capacity of a testator whose will may be controverted." The true meaning here of the words "occupying the position of a medical man," is not merely that the witness *is a* medical man, but that he must in order to exercise the privilege in question, have at sometime sustained the relation of medical attendant to the testator, or at least be shown to have had opportunity by adequate personal observation to form an opinion of his competency. Thus in *Weems* v. *Weems*, 19 Md. 345, the Court, citing *Townsend* v. *Townshend, supra*, says, "in general, the mere naked opinions of *persons not occupying the position of professional medical attendants*, as to the testamentary capacity of a testator whose will may be controverted, are not admissible." It will be observed that JUDGE COCHRAN uses the exact language of JUDGE MARTIN in the former case, *except* that for the words, "medical men," he substitutes "professional *medical attendants*," thus qualifying with evident deliberation the general expression of JUDGE MARTIN, and defining with precision the meaning of the rule. It also appears in *Weems* v. *Weems*, that "the opinion of Dr. Wilson was formed after he had examined the testator for the sole purpose of determining his mental condition ;" and it also appears in the opinion of the Court in *Crockett* v. *Davis*, that the witness whose opinion was admitted was a practising physician, "the son-in-law of the testatrix who knew her socially and *professionally* for many years."

In *Waters* v. *Waters*, 35 Md. 542, the Court said, " It ought to appear that the witness had an opportunity of forming a rational opinion "; and while these words were spoken of one who was neither a subscribing witness nor a medical expert, they are logically applicable to any witness called upon such

a question. The rule relating to the admission of the opinions of physicians in such cases is clearly stated in *Buswell on Insanity* as follows: " Such opinions may be founded, first upon facts, symptoms, and circumstances, bearing upon the substance of the issue and observed by the expert witness himself; or second, upon the testimony of other witnesses declaring such facts, symptoms or circumstances, and given in his hearing, or stated to him in proper form by the interrogating party; and since it is a rule of law that the question of competency of witnesses to testify as experts is to be decided in each particular case by the Court, in the exercise of its best discretion, it follows that no rule can be laid down strictly defining the qualifications of experts in cases where the issue is upon the sanity of the party." *Buswell on Insanity*, secs. 250 and 256.

The physician's privilege to testify his opinion in such cases is his, because his profession makes him an expert, first, when he is shown to have had the means of adequate personal observation, and second, when hypothetical questions are properly propounded to him, or when his opinion is given upon the the facts stated by others in his hearing. Now recurring to the principle upon which the rule is declared to rest in *Waters* v. *Waters, supra*, let us apply that test to the testimony of Dr. King. As was said by this Court in *Safe Deposit and Trust Co.* v. *Berry*, 93 Md. 560, " The witness, though a physician, was not an alienist, and did not attend the testator professionally;" and it was held that the reasons given by Dr. Bell for the opinion he expressed were too inconclusive to warrant any expression of opinion as to Mr. Berry's mental capacity. In the present case, Dr. King says: " I never attended him; only prescribed for him twice, about two years ago and again during February of the present year." Thus he anticipated the Court in declaring that these two casual prescriptions did not constitute him a medical attendant, and I do not think they can be held, for the purpose of affording him the opportunity of forming a rational opinion, the equivalent of medical attendance. For what ailment did he prescribe? It may have been for an ordinary cold, or for some accidental wound

or other *injury totally* disconnected 'with any necessity to observe his peculiarities of either body or mind, and requiring for the performance of his full professional duty, the most casual and perfunctory observation of the man.   True, he also said he had known him thirty years, but how intimately or well, does not appear.   We are not told how far he. lived from *him, or what degree of intercourse existed, if any ;* whether he saw him once a year—or once in ten years—whether he knew him well, as he knew his own daily companions and associates, or only as he knew those whose names were familiar, but who crossed his path rarely or never.   Under such circumstances. it must be incumbent upon the party offering the witness to· show in some manner that he is qualified as an expert, and it cannot be presumed, notwithstanding the apparent lack of opportunity to form a rational opinion, that such opportunity did in fact exist.   Looking at the matter in the light of reason alone, it not being concluded by any decision to which I have been referred, I should conclude that the question was erroneously allowed.   But looking further at *some of the ca*ses elsewhere which have dealt with the principles which underlie the question, I find the conclusion I have reached is fully sustained.

In *Prinsep and the East India Co.* v. *Sombre*, 10 Moore's. Privy Council Cases 232, Dr. LUSHINGTON said : " The judges of the Prerogative Court where questions of insanity are so frequently mooted, have always held that the most important evidence, where medical persons have been examined, is the *facts* to which they depose, rather than the opinions they have formed; that Court holding it more proper to draw its conclusions from facts rather than from the inferences of others *however skilled* in cases of insanity; not that the opinions of medical persons are disregarded but that the facts deposed to · furnish the safest evidence on which a judgement can be founded." In *Commonwealth* v. *Rogers*, 7 Metcalf, 500, CHIEF JUSTICE SHAW has thus stated the basic principle upon which such testimony is received ; " Some questions lie quite beyond the scope of the *observation and experience* of men in general,

but are quite within the observation and experience of those whose peculiar pursuits and profession have brought that class of facts frequently and habitually under their consideration. It is upon this ground that the opinions of witnesses who have long been conversant with insanity in its various forms, and who have had the care and superintendence of insane persons are received as competent evidence, even though they have not had the opportunity to examine the particular patient, and observe the symptoms and indications of disease at the time of its supposed existence."

In *Stackhouse* v. *Horton*, (2 McCarter), 15 N. J. Eq. 202, CHANCELLOR GREEN said : " The *abstract* opinion of any witness, medical or of any other profession is not of any importance. No judicial tribunal would be justified in deciding against the capacity of a testator upon the mere opinion of witnesses however numerous or respectable. ' * * * The opinion of a witness must be brought to the test of facts that the Court may judge what estimate the opionion is entitled to."

In *Commonwealth* v. *Rich*, 14 Gray, 335, which was a case of murder, the Massachusetts Court held that " a physician who has not made the subject of mental disease a special study, is not competent to testify whether a person *living in his neighborhood and well known to him, but who had never been his patient,* was competent to apply the rules of right and wrong in a state of circumstances concerning which he was under high excitement or the influence of an uncontrollable impulse."

In *Hastings* v. *Rider*, 99 Mass. 622, it was held : " On the issue whether an instrument offered for probate as a will was executed when the testator was of sound and disposing mind, the opinion of physicians who attended him professionally during a sickness in which he executed it, are admissible in evidence as to his mental capacity to make a will immediately before and after its actual execution, accompanied by statements of the symptoms and appearances on which such opinions were founded, .though they were not family physicians of the testator, nor had made special study of mental disease."

In the course of the opinion JUDGE GRAY said: "It is the duty of an attending physician to make himself acquainted with the peculiarities, bodily and mental, of a person who is the subject of his care and advice, and he has the experience which results from the performance of the same duty in other cases. He is therefore permitted to testify from his own observation to his opinion of his parent's mental capacity to make a will, in connection with the facts upon which that opinion is founded."

Through all these decisions there runs the same controlling idea, which our own Court in *Waters* v. *Waters, supra,* has formulated in the declaration that "it ought to appear that the witness had an opportunity to form a rational opinion." Suppose in the case before us that Dr. King had answered he did not consider the testator capable of executing a valid deed or contract, would it not shock any judicial tribunal to think of putting it in the power of a jury upon such testimony to decide against the capacity of a testator, and could we hesitate, if the jury in this case had so decided, to grant a new trial? We all know how controlling is the testimony of a competent and trusted physician in such cases, where it accords with the inclination of jurors, whatever direction that inclination may take. It was the perception of this paramount influence which induced this Court in *Safe Deposit and Trust Co.* v. *Berry, supra,* to disapprove a prayer, which, while not specifically saying that the opinions of the medical experts tended to prove the testator's mental incapacity, yet by directing the jury to consider them in connection with all this other evidence was regarded as giving undue prominence to these opinions. I can perceive no just ground for discrimination in our ruling upon this question because the jury sustained instead of setting aside the will. The next case presented to us might confront us with that situation, and we should so deal with the question now as we should then deal with it, if presented for the first time. To my mind it is clear that the question put to Dr. King was improperly allowed, upon the foundation disclosed in the record, and that for error in its

admission the ruling of the Circuit Court upon the second exception should be reversed.

(Filed January 17th, 1902.)